**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                   :

BARRY REITER,                         :        Civil Action No.
                                     :

                        Plaintiff,     :        **COMPLAINT**
           v.                        :
                                     :

MAXI-AIDS, INC. and ELLIOT ZARETSKY,  :       __**JURY TRIAL DEMANDED**__
in his individual and professional capacities,  :
                                     :

                       Defendants.    :
                                     :
-------------------------------------------------------------X

       Plaintiff Barry Reiter ("Mr. Reiter" or "Plaintiff"), by and through his undersigned counsel, Wigdor LLP, as and for his Complaint in this action against Defendants Maxi-Aids, Inc. ("Maxi-Aids" or the "Company") and Elliot Zaretsky ("Zaretsky"), (together, "Defendants"), hereby states and alleges as follows:

**PRELIMINARY STATEMENT**

       1.     Plaintiff Barry Reiter, a loyal and dedicated former Director of Business Development and Warehouse Manager at Defendant Max-Aids, Inc., was unlawfully and discriminatorily terminated from his employment at Maxi-Aids by Defendant Elliot Zaretsky because of his actual and perceived disability-status, as well as the disability status of his family members, in violation of the New York State Human Rights Law ("NYSHRL"), and because he sought to exercise his rights under the Family Medical Leave Act ("FMLA").

       2.     Specifically, Defendant Zaretsky, the founder and owner of Maxi-Aids, subjected Mr. Reiter to a constant barrage of discriminatory employment actions and offensive comments concerning Mr. Reiter's health ailments once Mr. Zaretsky learned of these conditions months into Mr. Reiter's employment. In fact, on several occasions, and at times in the presence of

others, Mr. Zaretsky told Mr. Reiter, point-blank, that had he (Mr. Zaretsky) known that Mr. Reiter was "so sick," he would never have hired Mr. Reiter in the first place. This discrimination culminated in Mr. Reiter's unlawful termination at the hands of Mr. Zaretsky after Mr. Zaretsky decided he could no longer have someone who was "so sick" working for him.

3.    In addition, after Mr. Reiter informed Mr. Zaretsky that he would need to exercise his rights under the FMLA in order to care for his then-hospitalized young daughter, Mr. Zaretsky made it clear to Mr. Reiter that Mr. Reiter was "useless" to him if he did not come to work, and, within days, callously fired Mr. Reiter.

4.    In fact, the unlawful motivations behind Mr. Zaretsky's decision to terminate Mr. Reiter became clear when Mr. Zaretsky informed Mr. Reiter that he was being terminated, as Mr. Zaretsky falsely claimed that the firing was an economically motivated "layoff," despite the fact that Mr. Zaretsky had recently hired an individual to take over an additional position that Mr. Reiter had been handling for nearly a year, and also was actively looking to hire other new employees.

5.    When pressed by Mr. Reiter about this discrepancy, Mr. Zaretsky was unable to provide a cogent answer, but simply told Mr. Reiter that his mind was made up and that there was nothing that could be done, cruelly leaving Mr. Reiter and his family without an income or certain continued access to their health insurance, which they desperately needed.

6.    However, Mr. Reiter's termination was just one in a long line of shocking and outrageous instances in which Mr. Zaretsky unlawfully harassed and discriminated against employees or prospective employees at Maxi-Aids with disabilities, or who needed to take time off from work to tend to sick family members, invariably resulting in the employee's termination

or forced resignation/constructive discharge. This serial, disgusting unlawful behavior perpetrated by Mr. Zaretsky is simply out of control.

7.      Mr. Reiter, by filing this lawsuit, seeks redress for the unlawful conduct committed against him, as well as to end Defendants' unlawful employment practices once and for all.

8.      Specifically, Mr. Reiter seeks declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Mr. Zaretsky and the Company's unlawful employment practices in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*., and the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 *et seq*.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

11.     Simultaneously with the filing of this action, Mr. Reiter will file a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.* against Defendants.

12.     As soon as the EEOC completes its investigation into Mr. Reiter's complaint and/or issues a Notice of Right to Sue, Mr. Reiter will seek leave to amend this Complaint to add ADA claims against Defendants.

13.     Any and all other administrative prerequisites have been met.

### PARTIES

14.     Plaintiff Reiter is a resident of Merrick, New York.  At all relevant times, Mr. Reiter worked for Maxi-Aids in its Farmingdale, New York location as its Director of Business Development, and at other relevant times, as its Warehouse Manager.  At all relevant times, Mr. Reiter fell within the definition of a "person" and/or an "employee" under all applicable statutes.

15.     Defendant Maxi-Aids, Inc. is a multi-million dollar company that specializes in selling health and lifestyle products to individuals with physical and mental disabilities.  Maxi-Aids is a domestic corporation organized under the laws of the State of New York, and maintains its principal and only office at 42 Executive Boulevard, Farmingdale, New York 11735.

16.     At all relevant times, Maxi-Aids was an "employer" within the meaning of all applicable statutes.

17.     Defendant Elliot Zaretsky is the President and founder of Maxi-Aids, having started the company in 1986.  In his capacity as President, Zaretsky has participated directly in the unlawful discrimination against Mr. Reiter.  Upon information and belief, Zaretsky resides in Queens County, New York.

## FACTUAL ALLEGATIONS

I.     **Mr. Reiter Was a Loyal and Dedicated Maxi-Aids Employee, Who Routinely Voiced His Opposition to the Unlawful Employment-Related Activities Committed by Mr. Zaretsky Against Himself and Other Employees**

18.     In March 2012, Mr. Reiter began working at Maxi-Aids as its Director of Business Development.

19.     Prior to extending an offer of employment to Mr. Reiter, Mr. Zaretsky asked Mr. Reiter whether Mr. Reiter would need health insurance coverage through the Company.  In response, Mr. Reiter informed Mr. Zaretsky that he would likely be able to take advantage of the insurance coverage provided by his wife's employer.  Mr. Zaretsky expressed satisfaction with Mr. Reiter's response, and, even though he had not revealed what salary Mr. Reiter would be offered, told Mr. Reiter that he would be "making too much money [in his position] to get health insurance."

20.     Mr. Zaretsky then extended an employment offer to Mr. Reiter at a salary that was significantly less than what Mr. Reiter was expecting (or what he had earned at his previous job), but assured Mr. Reiter that he (Zaretsky) would make sure that Mr. Reiter was "taken care of" financially, including by giving him salary raises, bonuses and sales commissions without being asked.

21.     Mr. Reiter accepted this offer, and over the next two years was an exemplary and dedicated employee, serving as Mr. Zaretsky's "right-hand man" in many respects.

22.     As a demonstration of Mr. Reiter's dedication to Maxi-Aids, Mr. Reiter would routinely go out of his way to make sure that the Company was in compliance with its legal requirements.

23.     Mr. Reiter risked his job and Mr. Zaretsky's scorn to warn Mr. Zaretsky that the behavior Mr. Zaretsky often exhibited towards female Maxi-Aids employees constituted sexual harassment.  For example, Mr. Zaretsky would become visibly upset at Mr. Reiter whenever Mr. Reiter would admonish him in this regard, and would try to minimize his behavior by telling Mr. Reiter that he was "just playing around."

24.     Mr. Reiter also warned Mr. Zaretsky about the illegal nature of his job candidate interviewing techniques.  Specifically, Mr. Zaretsky would routinely ask job applicants about their personal lives, including whether they were married, had children, and about their health status, and would then base employment decisions on the responses to these questions.  In particular, Mr. Zaretsky disfavored employees and employee applicants who had families and/or who had personal or family health concerns, as he felt that such individuals would be "problems" and "useless" to Maxi-Aids.

25.     Mr. Zaretsky not only disregarded Mr. Reiter's warnings, but even demanded that Mr. Reiter himself inquire into an applicant's personal life whenever Mr. Reiter interviewed applicants.  Mr. Reiter vehemently opposed these unlawful activities, much to the displeasure of Mr. Zaretsky, who would belittle Mr. Reiter for "not helping [him]," and complain that he (Zaretsky) had to "do everything [him]self."

26.     Indeed, after one female job applicant abruptly stormed out of Mr. Zaretsky's office after an interview, complaining that Mr. Zaretsky's interview questions were both illegal and "way out of line," Mr. Reiter asked to see the applicant's resume, wherein he saw that Mr. Zaretsky had made notes about the woman's marital status, number of children and health status. Mr. Reiter immediately cautioned Mr. Zaretsky that he needed to stop engaging in such unlawful and discriminatory behavior, and that the applicant could bring suit against the Company for the

questions he asked.  In response, Mr. Zaretsky candidly said "How else am I supposed to know if I want to hire her, what to pay her, whether she will take time off from work because of her kids, and whether I can expect her to have problems at work or with matters at home?"

27.     Moreover, another male job applicant, who Mr. Reiter interviewed and recommended for hiring, was later denied a position by Mr. Zaretsky after Mr. Zaretsky learned that the man had a minor health concern which would not have affected his work.  When Mr. Reiter confronted Mr. Zaretsky about why this qualified applicant was not hired, Mr. Zaretsky shockingly said, "He has problems, we don't want anyone like him."

**II.     Months Into His Employment, Mr. Reiter Revealed to Mr. Zaretsky That He Has Connective Tissue Disorder, Including Ulcerative Colitis and Rheumatoid Arthritis, and Lymphoma; Mr. Zaretsky Immediately Began to Harass, Demean and Discriminate Against Mr. Reiter Because of His Disabilities**

28.     In or around February 2013, Mr. Zaretsky became aware that Mr. Reiter suffered from Ulcerative Colitis, a health disorder that affects Mr. Reiter's colon and causes severe abdominal discomfort, as well as Rheumatoid Arthritis, an ailment that affects Mr. Reiter's joints, causing substantial pain.  Mr. Reiter also subsequently informed Mr. Zaretsky that he suffered from Lymphoma, a cancer of the blood.

29.     These disorders, while serious and painful, did not prevent Mr. Reiter from performing his job, but did require certain reasonable accommodations, including granting Mr. Reiter the ability to occasionally leave work early or arrive late in order to visit his physicians for check-ups.

30.     However, immediately upon learning about these disabilities, Mr. Zaretsky began a campaign of harassment against Mr. Reiter because of his illnesses, which included mocking him for being ill, and even going so far as to tell Mr. Reiter that he was "lucky" that he did not

tell Mr. Zaretsky about his health issues before Zaretsky hired him because Zaretsky would not have given Mr. Reiter a job.

31. In addition, in May 2013, after Mr. Zaretsky harassed Mr. Reiter about a request to leave work early in order to see a doctor, Mr. Reiter reminded Mr. Zaretsky of his illnesses and that he needed occasional reasonable accommodations. In response, Mr. Zaretsky ridiculed Mr. Reiter for being "sicker than [he was]," and "lucky" that Mr. Reiter already had health insurance from outside the Company. Mr. Zaretsky also expressed how thankful he (Zaretsky) was that he did not have to pay for Mr. Reiter's health insurance, and said that Mr. Reiter would "ruin the policy for everyone else" due to Mr. Reiter's health status.

32. These comments deeply offended Mr. Reiter, who had been nothing but a stellar and loyal employee of Maxi-Aids, despite the harassment and hostility he faced.

33. Furthermore, as Mr. Zaretsky became more aware of Mr. Reiter's disabilities, Mr. Zaretsky began to unfairly scrutinize Mr. Reiter's work and performance, in an attempt to manufacture reasons to terminate his employment and/or get Mr. Reiter to quit. Mr. Zaretsky even went so far as to surreptitiously call Mr. Reiter's wife on her cell phone to check up on calls Mr. Reiter made from his work phone.

34. Moreover, on several occasions, including one instance in early July 2013, Mr. Zaretsky falsely accused Mr. Reiter of not performing his job, and even arbitrarily threatened to fire him for no reason. At times, Mr. Zaretsky humiliatingly did this in front of Mr. Reiter's colleagues.

35. Mr. Zaretsky also constantly commented on how if he had he known that Mr. Reiter was sick before hiring him, he would never have extended Mr. Reiter an employment offer in the first place. Mr. Zaretsky even demanded that Mr. Reiter immediately cover up

bruises on his arm that resulted from blood work or infusion treatments Mr. Reiter had to undergo, because Mr. Zaretsky did not think it "looked good," and that the bruises made it look like Mr. Reiter was "taking drugs."

36.     Mr. Zaretsky knew that such hurtful and discriminatory comments would deeply offend Mr. Reiter and make him fear for his job, but continued to do so with impunity given his lack of regard for people with actual or perceived disabilities such as Mr. Reiter.

37.     Even more troubling, such disparaging comments were routinely made whenever Mr. Reiter requested a reasonable accommodation for his disability, such as to leave early from work to see a doctor, and were made pointedly whenever Mr. Reiter would ask Mr. Zaretsky for a raise in salary.

38.     Indeed, Mr. Zaretsky used Mr. Reiter's disability status (actual and perceived) as a basis for denying Mr. Reiter the raises that he had earned, and which Mr. Zaretsky had assured Mr. Reiter at the time he was hired that he would receive without having to ask.  In fact, Mr. Reiter was not given a raise at any point during his employment at Maxi-Aids.  Upon information and belief, Maxi-Aids employees who are not disabled, and/or are not regarded as such by Mr. Zaretsky, have been and continue to be given salary raises by Mr. Zaretsky.

**III.     Mr. Reiter Requests That He and His Family be Covered Through the Company's Health Insurance Plan, Like Other Similarly Situated Employees; Mr. Zaretsky Refuses, But, After Realizing That He Could Not Disparately Treat Mr. Reiter, Agrees to Provide Mr. Reiter, But Not His Family, with Health Insurance Coverage**

39.     In late December 2013, due to changes in Mr. Reiter's wife's employer's health insurance coverage, Mr. Reiter asked Mr. Zaretsky to allow him to be covered under Maxi-Aids's company-sponsored health insurance plan.

40.    Mr. Zaretsky refused Mr. Reiter's request, telling Mr. Reiter that the conditions of Mr. Reiter's employment were "No Insurance," and that he would cost the Company too much money to cover him.

41.    Mr. Zaretsky also complained that Mr. Reiter was taking too much time off from work (which was untrue, as Mr. Reiter seldom requested days off from work, and only occasionally left work early/arrived to work late because of doctor's appointments), and that Mr. Reiter should just be thankful that he has a job at all, given all of Mr. Reiter's health issues.

42.    Threatened with losing his job just for asking to be treated like similarly situated Maxi-Aids employees (who had company-sponsored health insurance coverage), Mr. Reiter tabled this request for a few weeks as he weighed his options.  However, by the end of January 2014, when it became apparent to Mr. Reiter that he needed health care coverage from Maxi-Aids, Mr. Reiter again approached Mr. Zaretsky about joining Maxi-Aids's employee health insurance plan.  Mr. Zaretsky again rebuked Mr. Reiter, telling Mr. Reiter that he made too much money to have Mr. Zaretsky pay for his health insurance.

43.    Realizing that Mr. Zaretsky was not going to be of any assistance, Mr. Reiter spoke to a member of Maxi-Aids's human resources department about health insurance coverage.

44.    Later, after Mr. Zaretsky seemingly was told that he could not discriminate against Mr. Reiter because of his disabilities by refusing to provide health insurance coverage that was offered to similarly situated employees, Mr. Zaretsky begrudgingly informed Mr. Reiter that he would allow the Company to provide health insurance coverage to Mr. Reiter.

45.    However, Mr. Zaretsky made it clear that the Company would not provide coverage for Mr. Reiter's family (which included Mr. Reiter's wife and two children), and that

Mr. Reiter would have to pay out-of-pocket to cover his family's insurance.  Mr. Zaretsky was

visibly angry when he informed Mr. Reiter about this so-called "accommodation."

46.     Mr. Reiter accepted Mr. Zaretsky's "offer," and his Maxi-Aids-sponsored health

coverage was set to begin on March 1, 2014.

**IV.   Mr. Zaretsky Punishes Mr. Reiter For Seeking Company-Sponsored Health Insurance By Terminating His Employment Just One Month After Mr. Reiter Begins to Receive Health Insurance From the Company**

47.     Immediately after Mr. Reiter was told that he would be covered by Maxi-Aids'

Company-sponsored employee health insurance plan, Mr. Zaretsky began to subject Mr. Reiter

to further unwarranted and intensified scrutiny, harassment and intimidation.   This was an

obvious bid to force Mr. Reiter out of the Company.

48.     For example, in February 2014, Mr. Zaretsky suddenly began to monitor Mr.

Reiter's computer activities in an attempt to manufacture reasons to terminate Mr. Reiter.

Examples of proof that Mr. Zaretsky was spying on Mr. Reiter include incidents in which Mr.

Zaretsky ordered Mr. Reiter to remove a photo of Mr. Reiter's wife from Mr. Reiter's computer

desktop, demanded that Mr. Reiter account for assignments he was doing for Mr. Zaretsky on his

computer, and falsely accused Mr. Reiter of lying to him about his computer activities.

49.     Furthermore, throughout the month of March 2014, Mr. Zaretsky reminded Mr.

Reiter that he was never supposed to get health insurance from the Company in the first place,

and that he would never have hired Mr. Reiter had he known about Mr. Reiter's disabilities,

purportedly because Mr. Reiter would have negatively affected the health insurance rates the

Company would have had to pay.

V.    **Mr. Reiter Informs the Company of His Intent to Invoke His Rights Under the Family Medical Leave Act to Care for His Hospitalized Daughter, But Within Days of Revealing This, He Is Unlawfully Terminated in Retaliation for Seeking to Exercise His FMLA Rights**

50.    In late March 2014, Mr. Reiter informed Mr. Zaretsky that his teenage daughter had been hospitalized, and that he likely would need to take time off from work once she was discharged to care for her at home.  Mr. Reiter even specifically told Mr. Zaretsky that he may need to "take family leave time," placing Mr. Zaretsky on clear notice of Mr. Reiter's intent to invoke his rights under the FMLA.

51.    In response, Mr. Zaretsky made his displeasure with Mr. Reiter's intent to exercise his FMLA rights clear by telling Mr. Reiter, point blank, "family comes first, and you [Mr. Reiter] have to do whatever you have to do, but know that you are useless to me when you are not here."

52.    Thereafter, on Friday, March 28, 2014, Mr. Zaretsky summoned Mr. Reiter to his office, and began to question Mr. Reiter about his daughter's illness in detail, in order to gauge just how much time Mr. Reiter would have to take off to care for her.  After sharing with Mr. Reiter how his granddaughter had similar health issues as Mr. Reiter's daughter, which had required a significant deal of attention, Mr. Zaretsky acknowledged that caring for Mr. Reiter's daughter would require a lot of Mr. Reiter's time and energy, but pointedly warned that it better not affect Mr. Reiter's work.

53.    At the end of the next workday, Monday, March 31, 2014, Mr. Zaretsky once again summoned Mr. Reiter to his office, where he informed Mr. Reiter that his employment at Max-Aids was being terminated.  Mr. Zaretsky falsely asserted that Mr. Reiter was being laid off, and that the termination was due to economic reasons.

54.     However, this reason was utterly and transparently false, as the Company had recently hired a new employee to become the Warehouse Manager, a role which Mr. Reiter had taken on in addition to his role as Director of Business Development for nearly the past year after the previous Warehouse Manager was terminated.   Moreover, Mr. Reiter was aware of the Company's plan to make additional new hires.

55.     In fact, upon information and belief, the Company has since hired a new employee who has now taken over all (or nearly all) of Mr. Reiter's former duties, including the handling of the Veterans Administration account, which is Maxi-Aids's largest account, and had been primarily Mr. Reiter's responsibility.

56.     When Mr. Reiter questioned Mr. Zaretsky about the obviously pretextual reasons Zaretsky was offering to justify the termination, Mr. Zaretsky could not come up with a straight answer, and instead told Mr. Reiter that he had "made up [his] mind" and that there was nothing he could do.

57.     The plain truth was that Mr. Reiter, who had been a loyal, dedicated, and exemplary "Company man" and employee for years, was not being fired as part of a layoff or because the Company was having economic difficulties.   Rather, Mr. Reiter was unlawfully terminated: (a) in retaliation for seeking to invoke his rights under the FMLA and take time off from work to care for his sick child; (b) because Mr. Zaretsky would no longer tolerate employing a person with Mr. Reiter's actual or perceived disabilities; and (c) in retaliation for Mr. Reiter's complaints about Mr. Zaretsky's discrimination against job applicants with disabilities.

**VI.    Mr. Zaretsky's and the Company's Disturbing Pattern or Practice of Discriminating, Retaliating Against, and/or Interfering With Employees Who Invoke or Seek to Invoke Their Rights Under the FMLA**

58.    Disturbingly, this was not the first time Mr. Zaretsky discriminated against, retaliated against or interfered with an employee who sought to invoke his or her FMLA rights.

59.    In fact, one former female Maxi-Aids purchasing agent who sought to take FMLA leave to address her own panic attacks and to care for a close family member who was suffering from alcoholism, was, upon information and belief, harassed, including sexually, by Mr. Zaretsky after she made him aware of her need to take time off, and was even asked to sign a letter of resignation by Mr. Zaretsky.  Upon information and belief, this employee ultimately resigned from her position at Maxi-Aids as a result due to the harassment and retaliation she faced at the hands of Mr. Zaretsky after she sought to exercise her FMLA rights.

60.    Similarly, another former female Maxi-Aids employee who suffered from ulcerative colitis and had to take time off to tend to her own illness and to a sick child, was regarded by Mr. Zaretsky as "no longer of value to the company" because she was taking time off due to her illness, and, ultimately, according to Mr. Zaretsky, "resigned" from the Company.

61.    In addition, a former male employee who took time off from work to take care of his mother who had breast cancer, was regarded by Mr. Zaretsky as a "problem" because of his absences, and was ultimately forced to quit and/or was constructively discharged due to Mr. Zaretsky's harassment.

62.    Furthermore, another former female Maxi-Aids employee, who worked as a buyer and purchasing manager, was subjected to hostility and unjustified scrutiny at the hands of Mr. Zaretsky once it was revealed that the employee's child was having health issues, ultimately resulting in that employee's resignation/constructive discharge. Mr. Zaretsky also would

frequently comment about this former employee's emotional and physical health in the presence of Mr. Reiter and other Maxi-Aids executives, to make it clear that the employee was no longer useful to the Company.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Family Medical Leave Act)

63.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

64.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  At all times relevant herein, Maxi-Aids was and is a "covered employer" within the meaning of the FMLA.  At all relevant times herein, Defendant Zaretsky was an "employer" within the meaning of the FMLA.

65.     Defendants were obligated to provide Plaintiff with 12 weeks of leave pursuant to the FMLA and reinstate him to the same or an equivalent position upon his return from approved leave.

66.     Defendants have violated the FMLA by unlawfully retaliating against Plaintiff for exercising rights protected by the FMLA by, *inter alia*, terminating him, subjecting him to an adverse employment action that would reasonably dissuade a reasonable person from exercising rights protected by the FMLA and preventing him from exercising his rights under the FLMA in the future.

67.     As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages, including, but not limited to, wages, salary, employment benefits and/or other compensation denied or lost to Plaintiff by reason of Defendants' unlawful conduct, plus interest, and other equitable relief.

68.    Plaintiff is entitled to an award of liquidated damages, as Defendants violated the FMLA, such conduct was not in good faith and there was not a reasonable basis for believing that such conduct was not a violation of the FMLA.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Discrimination in Violation of the New York State Human Rights Law)**

69.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

70.    Defendants have discriminated against Plaintiff in violation of the NYSHRL by denying him equal terms and conditions of employment, including, but not limited to, terminating his employment from the Company because of his disabilities, because Defendants regarded him as disabled, because of his record of disability and/or because of the actual or perceived disability-status of his family members.

71.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which he is entitled to an award of monetary damages.

72.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which he is entitled to an award of compensatory damages.

## AS AND FOR A THIRD CAUSE OF ACTION
**(Retaliation in Violation of the New York State Human Rights Law)**

73.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

74.     Defendants retaliated against Plaintiff for his engagement in protected activities, including, but not limited to, requesting and taking an accommodation for his disability, and for opposing Defendants' discrimination against employees and/or job applicants with disabilities. Defendants' retaliatory conduct includes, but is not limited to, the unlawful termination of Plaintiff's employment.

75.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income, compensation and benefits for which Plaintiff is entitled to an award of damages.

76.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which Plaintiff is entitled to an award of damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Aiding and Abetting Violations of the NYSHRL Against Defendant Zaretsky)**

134.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

135.    Defendant Zaretsky knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff stated herein in violation of the NYSHRL.

136.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of future income, compensation and benefits for which he is entitled to an award of monetary damages.

137.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is  entitled to an award of monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the state of New York;

B.    An award of damages, including liquidated damages, compensatory damages, and/or punitive damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

C.    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

D.    An award of damages to be determined at trial, to compensate Plaintiff for physical injuries, emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

E.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

F.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct; and

G.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 12, 2014
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
       Lawrence M. Pearson
       Tanvir H. Rahman

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
lpearson@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiff*