UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
BARRY REITER,

                        Plaintiffs,

-against-

MAXI-AIDS, INC. and ELLIOT ZARETSKY,
in his individual and professional capacities,

                        Defendants.
------------------------------------------------------X

MEMORANDUM AND ORDER

14 CV 3712
(Wexler, J.)

APPEARANCES:

    WIGDOR LLP
    By: Lawrence M. Pearson, Esq., Tanvir H. Rahman, Esq. & Kenneth D. Sommer, Esq.
    85 Fifth Avenue
    New York, New York 10003
    Attorneys for Plaintiff

    SILVERMAN ACAMPORA, LLP
    By: Keith J. Frank, Esq.
    100 Jericho Quadrangle
    Jericho, New York 11753
    Attorney for Defendants

WEXLER, District Judge:

    In this employment discrimination case, Plaintiff Barry Reiter ("Plaintiff" or "Reiter") sought damages for injuries sustained when he was terminated from his employment with defendant Maxi-Aids, Inc. ("Maxi-Aids") by Maxi-Aids' principal, defendant Elliot Zaretsky ("Zaretsky"). A jury trial was held, and the following claims were submitted to the jury— discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, discrimination under New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. L. § 290 *et seq.*, associational discrimination under the ADA, and retaliation under the ADA, NYSHRL, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* The jury entered a verdict in Plaintiff's favor as to the ADA associational disability and NYSHRL discrimination

claims, and in Defendants' favor on the remaining claims. The jury awarded compensatory damages in the amount of $0, and punitive damages in the amount of $400,000.

Currently before the Court is Defendants' post-trial motion under pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law or, alternatively, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. Defendants argue that relief is warranted for the following reasons: (1) there was insufficient evidence to prove the claim of associational discrimination; (2) punitive damages are not available for an ADA associational discrimination claim; (3) there was insufficient evidence to support a punitive damages award; (4) punitive damages are subject to a statutory cap of $50,000; and (5) the punitive damages award was excessive and should be remitted.[1] See Motion, Docket Entry ("DE") [103]. In addition to opposing Defendants' motion, Plaintiff has submitted his motion for economic damages. See DE [100].

## I. BACKGROUND

In brief, the testimony at trial revealed that Reiter was hired by Zaretsky and began working for Maxi-Aids in March 2012 with the job title Director of Business Development. His salary was $75,000 per year, plus commission of 1% of sales over $15 million. The issue of Plaintiff's participation in the company health plan arose at his interview, but Plaintiff did not request coverage as he was covered by his wife's health insurance plan.

Reiter had several medical conditions before and during his employment with Maxi-Aids. Prior to starting work with the company, he had been treated for lymphoma but was in remission at the time he began work. Plaintiff also suffered from colitis and mixed connective tissue disorder. He did not mention these conditions at the time of his hiring.

---

[1] Punitive damages are not available under the NYSHRL claim and thus may only be awarded if the ADA associational discrimination claim stands.

In May 2013, Plaintiff told Zaretsky about the colitis, and subsequently suffered an acute outbreak that required treatment and doctor's appointments. Once informed, Zaretsky started to ridicule Reiter "both publically and privately about my health conditions." Trial Transcript ("Tr.") at 102. Zaretsky referred to him as a "very sick person" who was lucky to have a job. *Id.* Zaretsky told Plaintiff on several occasions that if he had known Reiter was sick at the interview, he never would have hired him.

In December 2013, Plaintiff told Zaretsky that he needed to have himself and his family added to Maxi-Aids' health plan. Zaretsky refused this request, claiming that it was a condition of Reiter's employment that he would not get the company health insurance. Plaintiff asked again in January 2014, and testified that Zaretsky replied that Reiter was "too sick to be on the health plan, you make too much money to be on the health plan, it was a condition of your employment that you were never to have medical, you're basically unemployable." Tr. at 113. Reiter responded by telling Zaretsky that he could not discriminate against him because of his health conditions. Zaretsky maintained his position at the January meeting, but several weeks later, Reiter received an e-mail from an Human Resources representative and he was put on the Maxi-Aids' health plan effective March 1, 2014. His wife and three children, including his 16 year old daughter Bailey Reiter ("Bailey") were also put on the plan at Plaintiff's cost. Tr. at 116.

The previous year, in the fall of 2013, Reiter's daughter Bailey began experiencing panic attacks that rendered her inconsolable and resulted in Reiter having to pick her up from school many times. She began seeing a therapist, started medication, and began entertaining thoughts of suicide. On March 19, 2014, Bailey suffered a panic attack and revealed to Plaintiff that she had been out on the roof earlier and had been on the internet looking for ways to kill herself. After

3

consultation with a psychiatrist, Bailey was taken to the emergency room and diagnosed as "actively suicidal, chronic depression and acute anxiety disorder." Tr. at 124. She stayed in the hospital overnight, and the next day was admitted to the adolescent suicidal ward at South Oaks Hospital. She was discharged on March 25, 2014.

Plaintiff advised his supervisor, Larry DiBlasi, and Zaretsky of Bailey's situation within a day or so of its onset. On Friday, March 28, 2014, Plaintiff went to Zaretsky's office to discuss the situation and to request FMLA leave to care for Bailey. According to Plaintiff, Zaretsky responded that he had had an adolescent grandchild in a similar condition, and that it would require a lot of love, energy, and caring. Plaintiff claims that while Zaretsky acknowledged that Reiter needed to care for his family, he also told Plaintiff "if you're not here, you're useless to me." Tr. at 127.

At the end of the next business day, Monday, March 31, 2014, Zaretsky terminated Plaintiff's employment, stating that the company was underperforming financially. Reiter offered to assume the duties of a newly hired warehouse manager, but Zaretsky said his mind was made up. Zaretsky testified that the sole reason Reiter was terminated was failure to make sales. There was testimony from both Zaretsky and DiBlasi regarding Reiter's failure to perform at expected levels. DiBlasi testified that Reiter wasn't performing to expectations, and that he was aware Reiter's "job was in jeopardy for probably six months or so." Tr. at 216. DiBlasi did not know that Zaretsky was going to terminate Reiter on March 31, 2014. Tr. 237. Reiter testified that he never received any performance warnings. It was undisputed that there were no written warnings given to Reiter regarding his failure to meet sales expectations.

## II. RULE 59 MOTION

### A. Legal Standards

4

As provided by Rule 50(b), defendants have renewed their motions for judgment as a matter of law made prior to verdict. "In ruling on a motion for judgment as a matter of law, a district court must consider the evidence in the light most favorable to the non-movant and draw all reasonable inferences the jury could have drawn." *Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 75 (2d Cir. 2004); *see also Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228 (2d Cir. 2017) ("Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in h[is] favor" (internal quotation omitted)), *cert. denied*, No. 17-227, 2017 WL 3456814 (U.S. Oct. 16, 2017). The standard for granting a Rule 50 motion is high, and "[a] jury verdict should be set aside only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 79 (2d Cir. 2006) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (ellipsis in original) (internal quotations and citation omitted)). In evaluating the motion, the court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988)). It is enough that this testimony was in evidence for the jury to consider. Where defendants' liability turns on the jury's credibility determinations, the Court "cannot disturb" that determination unless the verdict was "egregious." *See James v. Melendez*, 567 F. Supp. 2d 480, 484 (S.D.N.Y. 2008) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

## C. Associational Discrimination under the ADA

Under the ADA, a party discriminates by "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. §12212(b)(4) A claim for associational discrimination under this section requires plaintiff establish: that he was qualified for the job; 2) that he was subjected to an adverse employment action; 3) that he was known at the time of that action to have a relative or associate with a disability; and 4) that the adverse employment action "occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016). Defendants argue that there was insufficient evidence to support the third and fourth elements.

### 1. Qualified Disability

Defendants first argue that there was no medical testimony supporting a finding that Bailey had, or was regarded as having, a qualifying disability under the ADA. They cite no legal authority, however, for the suggestion that medical evidence is necessary required to establish the existence of a qualifying disability in a case such as this. Upon review of the record, the Court finds that there was sufficient lay testimony for a jury to find that Bailey was disabled, or perceived to be disabled, within the meaning of the ADA.

Anxiety disorder may qualify as a disability. *See Spillers v. City of New York Health & Hosps. Corp.*, No. 15-CV-06472, 2017 WL 4326505, at *4, n.5 (E.D.N.Y. Sept. 28, 2017) (noting that "depression, psychosis, and generalized anxiety disorder can qualify as a disability under the ADA" (citing cases)); *see also Cody v. Cnty. of Nassau*, 577 F. Supp. 2d 623, 639 (E.D.N.Y. 2008) (anxiety disorder impairing the ability to work recognized as impacting major

6

life activity), *aff'd*, 345 F. App'x 717 (2d Cir. 2009). Attendance at school constitutes a major life activity under the ADA. *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (including "attending school" as a major life activity). There was ample lay testimony regarding Bailey's condition, which had been ongoing since the previous fall. For example, she testified that on numerous occasions, she had to leave school because of panic attacks. Reiter testified that at the time of the March 2014 incident leading to her hospitalization, Bailey was diagnosed as "actively suicidal, chronic depression and acute anxiety disorder." Tr. at 124.

Defendants make the additional argument that there was a lack of evidence that Bailey's condition was nothing more than a minor or transitory state not covered by the ADA. The record belies this argument as well. Bailey testified that the panic attacks led to her seeking therapy starting in the fall of 2013, evidencing a condition that had already persisted for a period of months. In addition, there was evidence that Zaretsky perceived Bailey as disabled and believed that her condition was serious and could be of long duration. Zaretsky testified that he had a granddaughter who was admitted to a psychiatric hospital. Reiter testified that during that conversation on Friday, March 28, 2014, Zaretsky indicated that based on his own experience "it would require a lot more time and love and energy and caring than I had any idea about." Tr. at 127. Thus there was evidence to support a jury finding that Bailey's condition was not transitory and/or that Zaretsky perceived it to be long-lasting.

2. A Determining Factor

As to the fourth element, Defendants acknowledge that there was evidence that they were aware of Bailey's claimed disability, but argue that there was no evidence that this knowledge was the reason for Plaintiff's termination. The Court disagrees.

7

Temporal proximity between the employer's knowledge and the adverse employment action may by itself constitute sufficient evidence of causality where the proximity is "very close." *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (noting that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (in Title VII case, finding three-week period between plaintiff's complaint and termination was "sufficiently short to make a prima facie showing of causation indirectly through temporal proximity"). Here, there was substantial evidence regarding the close temporal proximity between Defendants' acquisition of knowledge regarding Bailey's condition and their decision to terminate Plaintiff's employment. Defendants' awareness of Bailey's disability coupled with the their decision less than two weeks later to end Plaintiff's employment is sufficient evidence to allow a reasonable jury to infer that the disability of Plaintiff's daughter was a determining factor in the decision to terminate him.

There was also evidence that the financial reasons offered for Reiter's termination by Zaretsky were pretextual. Viewing the evidence in Plaintiff's favor, there was certainly sufficient evidence to support a jury's determination that Reiter's job performance was not the sole reason for his discharge, and that Zaretsky relied upon a manufactured financial reason to cover his real motivation for his actions – the association between Reiter and Bailey.

The jury was instructed that it could find that Maxi-Aids associated plaintiff with his daughter's disability if either Maxi-Aids believed, rightly or wrongly, that covering Bailey through the company health insurance policy would be expensive, or if Maxi-Aids feared that

Plaintiff would be distracted or inattentive at work due to Bailey's disability. There was sufficient evidence to support the jury's verdict under either theory.

There was significant testimony regarding Zaretsky's view on the health of his employees or potential employees and the resulting impact on the company's insurance policy. Reiter testified that the issue of his own health and need for health insurance was addressed at his interview by Zaretsky. Moreover, Zaretsky routinely asked this question of all interviewees. As to Reiter's own health issues, Reiter testified that Zaretsky noted he was lucky to have a job since he "was so sick that [he] would be unemployable" and that if Reiter had disclosed his conditions at the interview, Zaretsky wouldn't have hired him. Tr. at 102. As to the impact on Maxi-Aids' health plan, Reiter testified that prior to his joining the plan, Zaretsky had remarked that it was "lucky" Reiter was not on Maxi-Aids' health plan because "it would cost so much to take care of you that you would ruin the plan for everybody else in the company." Tr. at 110. According to Reiter, Zaretsky initially refused Reiter's requests to be added to the company health plan in December 2013 and January 2014, and it was only after Reiter complained that barring him from the company health plan was discriminatory that he was added effective March 1, 2014. While there was no direct testimony regarding any comments allegedly made by Zaretsky regarding the impact of *Bailey's* condition on the company health plan, the evidence of Zaretsky's attitudes coupled with the timing of Reiter's termination permit the jury to make the reasonable inference that Zaretsky was concerned about the effect of Bailey's condition on the plan and that this concern was a determining factor in the termination decision. Thus, the jury could determine that Zaretsky's concerns regarding the expense of Bailey's coverage to the company's health insurance policy, whether well-founded or not, led to his decision to terminate Reiter.

There was also testimony that Zaretsky believed Reiter would be distracted by Bailey's condition. At the Friday meeting preceding Reiter's Monday termination, Reiter testified that Zaretsky, referencing his own experiences with his granddaughter, indicated that "it would require a lot more time and love and energy and caring than I had any idea about." Tr. at 127. According to Reiter, Zaretsky went on to acknowledge that Reiter needed "to do what you need to do," but continued that "if you're not here, you're useless to me." *Id.* This evidence supports a finding that Zaretsky prospectively feared that Reiter would be distracted from his work during Bailey's treatment and recovery.

**D. Punitive Damages**

<u>1. Availability of, and Evidentiary Support for, Punitive Damages Award</u>

A party prevailing upon a claim of unlawful intentional discrimination under the ADA may recover punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Defendants argue that punitive damages are not available in an ADA associational discrimination claim, citing a case in this district that noted that "it is an open question in this circuit whether a plaintiff can seek punitive or compensatory damages for a violation of the anti-retaliation provisions of the ADA." *Infantolino v. Joint Indus. Bd. of Elec. Indus.*, 582 F. Supp. 2d 351, 362 (E.D.N.Y. 2008). An associational discrimination claim, however, arises from §12212 of the ADA, the discrimination provision, and not from §12203, the provision governing retaliation and coercion. As such, punitive damages may be awarded. The Court now turns to analysis of whether punitive damages are appropriate in this case and if so, a resolution of issues regarding that award.

10

An award of punitive damages is appropriate only upon evidence that the employer "discriminated (or retaliated) against him with conscious knowledge it was violating the law, or that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." *Tepperwien v. Entergy Nuclear Operations*, Inc., 663 F.3d 556, 573 (2d Cir. 2011) (internal quotations and citation omitted). "Malice and reckless indifference refer to 'the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 119 S. Ct. 2118, 144 L.Ed. 2d 494 (1999)). To establish malice or reckless indifference, "a plaintiff need not show that the defendant committed egregious or outrageous acts" but rather "need only demonstrate that the defendant had the 'requisite state of mind' of malice or reckless indifference." *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 356 (2d Cir. 2001) (citing *Kolstad*, 527 U.S. at 538).

The federal rights secured by the ADA were well-established before the events forming the basis of this case. The Maxi-Aids handbook containing the company's policies regarding compliance with the ADA includes a specific provision asserting the company's commitment to not discriminating against an employee "because they are related to or associated with a person with a disability." There is sufficient evidence that Zaretsky acted with reckless indifference to rights provided under the ADA. As discussed above, there was evidence of numerous incidents demonstrating Zaretsky's cavalier attitude regarding the provision of health insurance to his employees -- his practice of questioning interviewees on their need for coverage, his attitude about Reiter's own issues, and his initial refusal to add Reiter to the company health plan because he was "too sick." Reiter had previously raised the issue of discrimination with

11

Zaretsky when faced with the latter's first denial of the request to add him to the Maxi-Aids health plan. In addition, there is evidence of Zaretsky's concern regarding the effect of a 'sick' person on the company plan. Faced with Reiter's request to join the company plan, Zaretsky immediately asked if Reiter had cancer. These incidents taken together paint a picture of hostility towards the rights of employees that demonstrate, at the very least, a callous indifference to those rights. The jury's determination that Reiter's termination was done with the requisite state of mind of malice or reckless indifference is thus supported.

Defendants claim that there was absolutely no evidence supporting a finding that Zaretsky acted with malice or reckless indifference specific to Reiter's associational disability rights when he terminated Reiter's employment. Defendants essentially suggest that the jury was required to disregard any evidence regarding Zaretsky's attitudes regarding employee health as irrelevant as to the associational disability claim. Viewing the evidence in Plaintiff's favor, however, his termination was not an isolated incident of discriminatory behavior in violation of the ADA, but rather part of a pattern of discrimination and/or disregard for rights demonstrated by Zaretsky. Additional evidence of Zaretsky's malice or reckless indifference could be found in his conscious statement of a pretextual reason for Reiter's termination. Crediting the jury's verdict, the evidence supports the conclusion that Zaretsky was, at least, more than merely negligent, and that he acted with knowledge or with reckless indifference to the fact that his conduct would violate Reiter's rights.

### 2. Application of the Damages Cap

By statute, an award of punitive damages in intentional discrimination employment cases is capped to specific amounts based upon the number of employees at the company. Plaintiff concedes that if imposition of the cap is proper, damages in this case would be limited to $50,000 under 42 U.S.C. §1981a(b)(3)(A). He argues, however, that defendants have waived

12

their right to assert the cap because they failed to raise it as an affirmative defense. Affirmative defenses serve the purpose of putting a plaintiff on notice of legal defenses asserted by a defendant. In this case, the damages cap is plainly set forth on the face of the statute and application of its limitations cannot constitute any unfair surprise or prejudice to plaintiff. The Court finds that the cap set forth in § 1981a(b)(3) "is not an affirmative defense and is not waivable." *Oliver v. Cole Gift Ctrs, Inc.*, 85 F. Supp. 2d 109, 112 (D. Conn. 2000).[2]

The damages-capping statute "envisions that the level of punitive damages to be awarded will initially be set by the jury" and then reduced if necessary by the court to ensure that it conforms to the "relevant cap for an employer of the defendant's size." *Luciano v. Olsten Corp.*, 110 F.3d 210, 221 (2d Cir. 1997). Accordingly, the Court finds that any punitive damages award in this case is capped at $50,000.

### 3. Remittitur

Having determined that any punitive damages award is capped at $50,000, the Court turns to defendants' argument that punitive damages of any amount are not supported by the evidence. They claim that since the since the jury awarded no compensatory damages, the punitive damages award should be remitted in total and set aside.

The amount of a punitive damages award must be reasonable and "rational in light of their purpose to punish what has occurred and to deter its repetition." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21, 111 S. Ct. 1032, 113 L.Ed. 2d 1 (1991)). A punitive damages award should only be reversed if is "so high as to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876, 883 (2d Cir. 1988) (internal quotation and citation

---

[2] The Court further notes that the issue of the statutory cap was discussed with counsel during jury deliberations as part of a discussion of a jury question posed by note. At that time, Plaintiff's counsel did not dispute the applicability of the cap, but rather expressed only that the jury not be told about it.

13

omitted). The Court must also keep in mind the purpose of punitive damages, which "'are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example.'" *Stampf v. Long Island R. R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (quoting Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed.1984)). The Court may consider several factors in assessing the reasonableness of an award. *See generally BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 134 L.Ed. 2d 809 (1996) (suggesting "guideposts" for consideration such as the degree of reprehensibility of the conduct, the disparity between harm suffered and the award, and the difference between the award and civil penalties imposed in comparable cases).

Although the disparity in the amounts of compensatory and punitive damages may be considered when assessing a punitive damages award, the jury's decision to award no compensatory damages is not dispositive in an employment discrimination context. The Second Circuit has found that in Title VII cases, "[a]n award of actual or nominal damages is not a prerequisite for an award of punitive damages." *Cush-Crawford*, 271 F.3d at 357. The reasoning set forth in that decision is equally applicable in the ADA employment discrimination context. The Second Circuit further observed that "[t]here is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm." *Id.* at 359. Furthermore, in light of the testimony about Zaretsky's apparent disregard of his employees' rights, the jury could well have found that punitive damages were warranted to meet the deterrence goal of such an award.

As to the amount of the award, Plaintiff has provided citations to ADA cases in which punitive damages awards in far greater amounts were awarded. *See, e.g., Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 132 (2d Cir. 2008) (affirming reduction of punitive damages from $5 million to statutory cap amount of $300,000). Defendants do not provide any case law suggesting that $50,000 is an unreasonable amount, relying instead upon their argument that a punitive damages award of any amount is unsustainable in the face of the jury's failure to award compensatory damages. Upon review of the record and the cases, the Court finds that an award of the statutory cap amount of $50,000 does not shock the conscience or violate due process, and is supported by the evidence.

### III. RULE 59 MOTION FOR A NEW TRIAL

Defendants move alternatively under Rule 59, which allows the court to grant a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59 (a)(1)(A). This standard is "less stringent" than that required for relief under Rule 50. *Olsen v. Cnty. of Nassau*, 615 F. Supp. 2d 35, 39 (E.D.N.Y. 2009). "In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion is less onerous for the moving party in two ways: first, '[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict.' Second, in deciding a Rule 59 motion 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012) (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134). While the court may independently weigh the evidence, a motion for a new trial should only be granted if the court is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice and that the verdict is

15

against the weight of the evidence. *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003).

Weighing the evidence, the Court cannot conclude that the jury's verdict constituted a seriously erroneous result or a miscarriage of justice. In particular, the Court found Zaretsky's testimony lacked credibility. Much of his testimony at trial stretched believability and often conflicted with prior sworn testimony given by him. Finding no reason to disturb the jury's verdict, the motion for a new trial is denied.

## IV. CONFIDENTIAL TRIAL MATERIAL

Defendants seek an order "maintaining the confidentiality" of certain trial testimony and exhibits. Defendants provide no legal support for this request, which Plaintiff has not addressed in his opposition to the motion. To the extent Defendants seek an order sealing the information, the request is denied.

The public has a right of access to judicial documents. *See Nixon v. Warner Communc'ns, Inc.*, 435 U.S. 589, 596, 98 S. Ct. 1306, 55 L.Ed. 2d 570 (1978); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119 (2d Cir. 2006). In addition to the common law right of access, "it is well established that the public and the press have a qualified First Amendment right to attend judicial proceedings and to access certain judicial documents." *Lugosch*, 435 F.3d at 120 (internal quotation omitted). There is a "strong presumption of access" to judicial documents, "under both the common law and the First Amendment." *Id.* at 121. The documents and testimony at issue were made part of the record in a public proceeding, and Defendants have offered no rationale or argument that overcomes the presumption of public access. As such, the motion is denied.

## V. ECONOMIC DAMAGES

Reiter seeks economic damages in the total amount of $6,626.87[3] for lost income and two months of COBRA payments made after his termination. *See* DE [100]. Defendants have indicated that these amounts "can be agreed upon" by them. *See* DE [101]. Plaintiff's motion is granted to the extent that he is awarded economic damages of $6,626.87, plus pre-judgment interest.

Despite the fact that there has been no entry of judgment in this case, Plaintiff also claims that he is entitled to post-judgment interest on the punitive damages award from July 21, 2016, the date of the jury decision, forward. Plaintiff has presented no argument that persuades the Court to depart from the plain statutory language that post-judgment interest "shall be calculated from the date of the entry of judgment." 28 U.S.C. §1961(a). Thus, Plaintiff's motion to commence the accrual of post-judgment on July 21, 2016 is denied.

## VI. CONCLUSION

For the reasons set forth above, Defendants' motion [103] is granted only to the extent that the statutory cap reducing punitive damages to $50,000 shall be imposed, and is denied in all other respects. Plaintiff shall electronically file a proposed judgment consistent with this opinion by **January 31, 2018.**

SO ORDERED.

/s/ Leonard D. Wexler
_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
January 19, 2018

---

[3]The letter misstates the total amount on the first page. The correct figure is $6,626.87, which includes two COBRA payments totaling $953.84 and lost wages of $5,673.03.